25-2049
*SS&C Technologies Holdings, Inc. v. Arcesium LLC*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2025

(Argued: May 21, 2026 Decided: November 3, 2026)

Docket No. 25-2049-cv

---

SS&C TECHNOLOGIES HOLDINGS, INC., ADVENT SOFTWARE, INC.,
*Plaintiff-Counter-Claimants-Counter-Defendants-Appellants*,

v.

ARCESIUM LLC,
*Defendant-Counter-Claimant-Appellee.*

---

Before: SACK, LIVINGSTON, AND CARNEY, *Circuit Judges*.

Plaintiff-Appellants SS&C Technologies Holdings, Inc., and Advent Software, Inc., (together, "SS&C"), appeal from a December 20, 2024 order of the United States District Court for the Southern District of New York granting Defendant-Appellee Arcesium LLC's motion to dismiss. On appeal, SS&C argues that the district court erred in dismissing its claims for trade secret misappropriation because its complaint properly alleged facts from which misappropriation could be inferred, and because the district court engaged in impermissible fact-finding. We agree. SS&C's First Amended Complaint sufficiently stated a claim for trade secret misappropriation, and the district court should not have credited Arcesium's interpretation of the facts over SS&C's. Because we reverse the district court's dismissal, we need not decide whether the district court properly denied SS&C's motion to vacate judgment and amend its complaint. **REVERSED AND REMANDED.**

STEPHEN FISHBEIN (John A. Nathanson, Christopher L. LaVigne, Eric S. Lucas, Benjamin Klebanoff, *on the brief*), Allen

Overy Shearman Sterling US LLP, New York, NY, *for Plaintiff-Appellants*;

JAMES J. PASTORE, JR. (Mark P. Goodman, Wendy B. Reilly, Brandon Fetzer, *on the brief*), Debevoise & Plimpton LLP, New York, NY, *for Defendant-Appellee*.

SACK, *Circuit Judge*:

Plaintiff-Appellants SS&C Technologies Holdings, Inc. ("SS&C Technologies"), and Advent Software, Inc., ("Advent," and collectively with SS&C Technologies, "SS&C"), sued Arcesium LLC ("Arcesium") for trade secret misappropriation after a discovery exchange in a prior antitrust action revealed that Arcesium may have used trade secrets in SS&C's software program, Geneva, to develop its own competing program. The district court (Reif, *J.*)[1] granted Arcesium's motion to dismiss, concluding that while SS&C's complaint did adequately allege that SS&C possessed trade secrets in Geneva, it did not adequately allege that Arcesium misappropriated them.

We disagree. SS&C's complaint adequately alleges facts that, if accepted as true for these purposes, would constitute misappropriation. We therefore REVERSE the district court's order granting Arcesium's motion to dismiss and

---

[1] Timothy M. Reif, *Judge*, United States Court of International Trade, sitting by designation.

REMAND the case to the district court for further proceedings consistent with this opinion.

On appeal, SS&C also challenges the district court's denial of its motion to (1) vacate the order of dismissal and (2) amend its complaint. Because we conclude that the district court erred in granting the motion to dismiss, these issues are moot, and we therefore need not and do not reach them.

**REVERSED AND REMANDED.**

## BACKGROUND

### I. Factual Background[2]

Appellants SS&C Technologies and Advent (collectively "SS&C") and Appellee Arcesium compete with one another in the financial technology sector. SS&C is a global provider of AI-enabled software services for the financial and

[2] Most of the facts come from SS&C's First Amended Complaint, "and because [they] . . . appeal from an order granting a motion to dismiss, we accept all factual allegations in the complaint as true." *Salazar v. King*, 822 F.3d 61, 68 n.5 (2d Cir. 2016). At the outset of the district court case, the district court required Arcesium to produce twenty-three documents that SS&C identified as being integral to its case. SS&C incorporated these materials by reference into its First Amended Complaint but did not attach them as exhibits. Because a plaintiff's "complaint is deemed to include any . . . statements or documents incorporated in it by reference," or any documents that are "integral" to the complaint, *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam), we also include details from those documents in our retelling of the facts. All references to "the complaint" are to the redacted First Amended Complaint ("Compl."), Joint App'x 108–50, unless otherwise noted.

health industries. SS&C's product, Geneva, is one of its signature offerings. Geneva, which is portfolio accounting software, consolidates firm-wide data into a single source to provide "a comprehensive, accurate, and timely view of portfolio data across an entire firm." Compl. ¶ 15. Asset managers, hedge funds, and other entities in the financial sector use Geneva to obtain a real-time assessment of a firm's overall performance.

Geneva was initially developed and licensed by Advent. It contains "confidential and proprietary trade secrets," such as "the executable version of the Geneva software; Geneva's integration layer, which includes application programming interfaces[;] . . . Geneva's data model;" and other aspects of the software program. *Id*. ¶¶ 20, 21. Geneva's "object code," for example, "performs proprietary portfolio accounting functions," and the software's unique interface allows users to both input and output data from the program. *Id.* ¶¶ 21, 22. Each of Geneva's allegedly proprietary features could be properly accessed only by customers with valid licenses and credentials, and Advent required each customer to enter into confidentiality and non-disclosure agreements with respect to that information.

In 2015, Advent and Appellee Arcesium entered into a Hosted Reseller Agreement (the "HRA"), in which Advent authorized Arcesium to "sublicense" Geneva to Arcesium's customers and "provide certain Geneva-related services to those customers." *Id.* ¶ 38. Arcesium, a financial technology firm, "sought to offer customers a single, integrated solution where Geneva . . . was deployed alongside, and integrated with, the Arcesium platform." *Id.* ¶ 35. In other words, Advent built and owned the product, and Arcesium, through its license, assisted customers in using the product. Under the five-year HRA, Arcesium was prohibited from using Geneva to build its own competing products, nor could it "disclose . . . [SS&C's] confidential information" or continue to use Geneva after the HRA expired. *Id.* ¶ 40. Because Advent sublicensed Geneva to Arcesium for the purpose of allowing Arcesium to provide customer support to Geneva users, the HRA permitted Arcesium to use Geneva "solely to perform for the benefit of Customers under the applicable Customer Agreement." *Id.* ¶ 38. Arcesium also agreed "not to use" any of Geneva's proprietary information "for any purpose other than to perform its obligations or exercise its rights" under the HRA. *Id.* ¶ 40.

In 2015, after Arcesium and Advent entered into the HRA, SS&C Technologies acquired Advent, thereby becoming the owner of Geneva, and inheriting the HRA agreement with Arcesium. SS&C, like Arcesium, also provided Geneva-related services to clients using the software.

Because much of Arcesium's business involved assisting customers with Geneva-related problems, Arcesium realized that its "reliance on Geneva significantly limit[ed] [its] ability to grow [its] business." *Id.* ¶ 44. Internally, employees expressed concerns that without access to Geneva, reports necessary to Arcesium's customer service business would "not [be] available on the [Arcesium] platform." *Id.* ¶ 50. In response, Arcesium's Chief Executive Officer ordered that "Geneva access be maintained till tech can fix all the issues" with Arcesium's own platform. *Id.* In another internal email, Arcesium staff noted various technical shortcomings in its platform, identified the method that Geneva used to avoid those shortcomings, and recommended importing similar methods to its own platform.

So, while Arcesium had access to the Geneva software under the HRA, Arcesium began developing its own competing portfolio accounting software, which it called "Trinity." Arcesium was able to develop Trinity in less than three

years, much faster than the "decades" Advent took to develop Geneva. *Id.* ¶ 18. On June 18, 2020, Arcesium's CEO declared that it would take "12 months, at minimum" to transition from Geneva to another provider's portfolio accounting software. *Id.* ¶ 54. Only eight months after this declaration, Arcesium was "implementing its Trinity portfolio accounting software at a client . . . without any transition assistance from SS&C."

While Arcesium was developing Trinity, SS&C allowed the HRA to expire in January 2020. At that time, the HRA required Arcesium to "cease all use of" Geneva, but it gave Arcesium limited rights to continue to provide Geneva and Geneva-related services to existing customers. *Id.* ¶ 41. The parties refer to these as Arcesium's "run-off" rights. *Id.* Yet in April 2020, SS&C learned that Arcesium was still marketing its Geneva-related services to *prospective* customers, including to a hedge fund customer. Because SS&C was of the view that this continued use of Geneva violated the HRA, the company purported to terminate Arcesium's run-off rights. Alleging that the termination of these run-off rights breached the HRA

and violated antitrust laws, Arcesium sued SS&C. *Arcesium, LLC v. Advent Software, Inc.*, No. 1:20-cv-04389 (S.D.N.Y. June 9, 2020), ECF No. 1.[3]

Still, Arcesium assured its customers, for whom Arcesium provided Geneva-related support, that it could still offer the same level of portfolio assistance without relying on Geneva. When asked by one customer how it would accomplish that, Arcesium told the customer that a Geneva-specific feature "w[ould] be available" on its own Trinity platform. *Id.* ¶ 57. In a sales pitch to another Geneva customer in which Arcesium was trying to convince the customer to switch from using Geneva to using Trinity, Arcesium promised that Trinity's software would have "the same JE line functionality that [the company] currently offer[s] through Geneva," as well as "the same tax lot methodologies" and "[s]upport for all transaction types [Arcesium] currently offer[s]." *Id.* In fact, the final Trinity product contains many features similar to Geneva, including its data model and parts of its integration layer.

Over email, Arcesium employees discussed removing any references to Geneva from internal documentation about the Trinity project. For example, a

---

[3] In March 2021, the district court granted SS&C's motion to dismiss Arcesium's antitrust claims; Arcesium declined to file an amended complaint. *Arcesium, LLC v. Advent Software, Inc.*, No. 1:20-cv-04389 (S.D.N.Y. May 6, 2021), ECF No. 113.

senior development executive directed the technical team to refrain from explaining any technical "requirements" for Trinity by referencing "what Geneva does." *Id.* ¶ 55. In other words, "rather than saying, 'This is how Geneva does it, so we should do it that way too,'" the executive directed the team to discuss how they needed the program to work "in general." *Id.*

Although Trinity was designed to be Arcesium's own in-house portfolio analysis software, this new software would still not allow Arcesium to service customers who wanted to continue to use Geneva post-HRA expiration. Arcesium then started a second project, "Nautilus," that SS&C alleges made it possible for Arcesium to continue to access Geneva without SS&C's knowledge or consent. Arcesium knew that this project came with, as they put it, "IP constraints," since the Geneva loader formats—which enable the Arcesium platform to use the Geneva software—are the "vendor's [SS&C's] intellectual property." *Id.* ¶ 62. Despite acknowledging that it was "not appropriate for Arcesium to produce or use these formats without having a direct contractual relationship" with SS&C, Arcesium appears to have used Geneva's integration layer, database scheme, and data model to develop Nautilus. *Id.*

## II. Procedural History

SS&C then brought suit against Arcesium in the Southern District of New York alleging trade secret misappropriation in violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.*[4]

At the outset of the proceedings, the district court asked Arcesium to produce certain documents that, through the previously discussed antitrust lawsuit, SS&C had learned were likely relevant to its misappropriation claim. SS&C then amended its complaint to refer to information in and quote from those documents. Arcesium moved to dismiss the First Amended Complaint, and it attached to that motion some of the documents referred to in SS&C's complaint, including internal Arcesium email threads and a declaration by Arcesium's Head of Technology.

The district court granted Arcesium's motion to dismiss, concluding that while the complaint adequately alleged that SS&C possessed various trade secrets in Geneva, it did not "allege facts that might support a reasonable inference that

[4] SS&C also brought various state common law claims, including a claim for common law misappropriation of trade secrets. Because the standard for a misappropriation claim under New York common law, (1) existence of a trade secret and (2) improper use of that secret, *see N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 43–44 (2d Cir. 1999), is essentially the same as the standard under the DTSA, we do not conduct a separate analysis for the state law misappropriation claim. The remaining state law claims are not before us on appeal.

[Arcesium] misappropriated Geneva information." *SS&C Techs. Holdings, Inc. v. Arcesium LLC*, No. 22-CV-02009 (TMR-OTW), 2024 WL 5186530 (S.D.N.Y. Dec. 20, 2024).[5]

SS&C appeals.

## DISCUSSION

### I. Standard of Review

We review "a district court's dismissal of a complaint for failure to state a claim *de novo*." *Cardinal Motors, Inc. v. H&H Sports Prot. USA Inc.*, 128 F.4th 112, 120 (2d Cir. 2025). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Int'l Code Council, Inc. v. UpCodes Inc.*, 43 F.4th 46, 53 (2d Cir. 2022) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009)). We "accept[] all well-pleaded allegations in the complaint as true, drawing all reasonable inferences in the plaintiff's favor." *Operating Loc. 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 91 (2d Cir. 2010). Thus, "[f]act-specific questions cannot be

[5] Unless otherwise indicated, we omit all internal quotation marks, alteration marks, emphases, footnotes, and citations when quoting cases.

resolved on the pleadings." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012).

**II. Relevant Law**

The Defend Trade Secrets Act of 2016, codified at 18 U.S.C. § 1836 *et seq.*, creates a private, federal cause of action for trade secret misappropriation. Pub. L. No. 114–153, 130 Stat. 376. "To state a claim for trade secret misappropriation under the DTSA, a plaintiff must prove that (1) it possessed a trade secret, and (2) the defendant misappropriated the trade secret." *eShares, Inc. v. Talton*, 727 F. Supp. 3d 482, 491 (S.D.N.Y. 2024).

Incorporating the definition from the Economic Espionage Act of 1996, Pub. L. 104–294, 110 Stat. 3488, the DTSA recognizes that, under certain conditions, nearly anything could be a trade secret, including, but not limited to, "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible." 18 U.S.C. § 1839(3).

While the statute does not place limits on the *types* of things that may qualify as a trade secret, it does impose a few additional requirements. First, the owner of

a trade secret must "take[] reasonable measures to keep [the] information secret." *Id.* § 1839(3)(A). Second, the information alleged to be a trade secret must "derive[] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." *Id.* § 1839(3)(B).

Although plaintiffs alleging possession of a trade secret must plead the trade secret with "specificity," the complaint need only include enough information to give a defendant "notice of the bases for the claim being made against it." *Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp., Inc.*, 68 F.4th 792, 801 (2d Cir. 2023).

Once a plaintiff has satisfied the first prong of the DTSA inquiry—possession of a trade secret—the court must determine whether the complaint adequately alleges misappropriation. In relevant part, the DTSA defines misappropriation as the:

> acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or disclosure or use of a trade secret of another without express or implied consent by a person who . . . used improper means to acquire knowledge of the trade secret.

18 U.S.C. § 1839(5)(A)–(B)(i). It defines "improper means" to include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." *Id.* § 1839(6)(A). Improper means does not include "reverse engineering, independent derivation, or any other lawful means of acquisition." *Id.* § 1839(6)(B).

As with any other claim at the pleading stage, a complaint alleging misappropriation must plead more than facts "merely consistent with" a defendant's liability; rather, it must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

**III. Analysis**

On appeal, SS&C argues that the district court erred in granting Arcesium's motion to dismiss when its complaint contains both direct allegations of Arcesium's misappropriation and facts from which misappropriation could be inferred. Arcesium argues to the contrary for affirmance on the grounds that SS&C failed to plead sufficiently: (1) the existence of trade secrets and (2) the misappropriation of alleged trade secrets. We reject both of Arcesium's arguments. We conclude that SS&C's complaint plausibly alleges the existence of

trade secrets. And we agree that SS&C's complaint contains direct allegations of use that, at least as supported by other circumstances alleged by SS&C, are sufficient to state a claim for trade secret misappropriation.

**a. Existence of Trade Secrets**

To sufficiently allege the existence of a trade secret, a plaintiff bringing a misappropriation claim must identify a thing or things that constitute the trade secret, and it must allege both that it "has taken reasonable measures to keep [the] information secret" and that "the information derives economic value" from its secrecy. 18 U.S.C. § 1839(3)(A), (B).

SS&C's complaint alleges that it possesses trade secrets in, among other things, "the executable version of the Geneva software; Geneva's integration layer, which includes application programming interfaces," and "Geneva's data model." Compl. ¶ 20. Much of the information alleged by SS&C, such as "[c]onfidential proprietary data relating to . . . systems[] and methods are protected by trade secret law." *In re Dana Corp.*, 574 F.3d 129, 152 (2d Cir. 2009). Because "programs," "codes," and "all forms and types of . . . information" may be trade secrets under the DTSA, *see* 18 U.S.C. § 1839(3), we move on to the next step of the analysis, reasonable measures.

Trade secrets can take many different forms, and so what constitutes "reasonable measures" will vary from case to case. A book containing handwritten secret recipes, for example, will be stored, and therefore protected, differently from an electronic file. Where, as here, the trade secret involves parts of a software program, "'reasonable measures' to safeguard [the] trade secret" may include "requiring licensees to agree to confidentiality." *Pauwels v. Deloitte LLP*, 83 F.4th 171, 182 (2d Cir. 2023).

Arcesium insists that SS&C did not sufficiently protect its alleged trade secrets because "every licensed user has access to the executable version of Geneva," including "its integration layer and associated reports, and its database scheme and data model." Appellee's Br. at 44–45. We reject this narrow interpretation of "reasonable measures," because we fear that it would create a near-blanket rule that any information shared with a third party cannot be a trade secret.

Instead, we agree with the Ninth Circuit that "[p]roviding alleged trade secrets to third parties does not undermine a trade-secret claim, so long as the information was provided on an understanding of confidentiality." *VBS Distribution, Inc. v. Nutrivita Lab'ys, Inc.*, 811 F. App'x 1005, 1009 (9th Cir.), *cert.*

*denied*, 141 S. Ct. 454 (2020). SS&C's complaint states that the program "can be accessed only by SS&C personnel and customers with valid licenses . . . subject to agreements with those customers that contain strict non-disclosure and confidentiality provisions." Compl. ¶ 26. SS&C's agreement with Arcesium had such provisions, and SS&C alleges that all customers who use Geneva sign non-disclosure agreements before the trade secret information is disclosed to them. We therefore conclude that SS&C sufficiently alleges that it takes reasonable measures to protect Geneva.

As to the final step, independent economic value, SS&C alleges that "[t]he Geneva Trade Secret information derives independent economic value, actual and potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of such information." Compl. ¶ 96. Typically, such "legal conclusions . . . constitut[ing] 'little more than a paraphrase of the statute' . . . cannot, standing alone, establish a plausible claim." *Bonn-Wittingham v. Project OHR, Inc.*, 792 F. App'x 71, 75 (2d Cir. 2019) (summary order) (quoting *DeJesus v. HF Mgmt. Servs.*, LLC, 726 F.3d 85, 89 (2d Cir. 2013)). However, that is not the case here.

SS&C's complaint "alleg[es] . . . particular facts sufficient to raise a plausible inference," *DeJesus*, 726 F.3d at 89, that its Geneva platform "derives independent economic value" from its programming and functions not being generally known. It claims that the company developed Geneva "over several decades," "invest[ing] . . . significant time and hundreds of millions of dollars" to create "a highly competitive portfolio accounting product." Compl. ¶ 18. SS&C also alleges that the product's "unique data and processing model, combined with its powerful standard and custom reporting capabilities," provide its customers with "the ability to analyze and view data in a variety of useful ways." *Id.* ¶ 19. That functionality, according to SS&C, is built on "methodologies, models, and processes" that are "highly confidential." *Id.* From these allegations, it can easily be inferred that Geneva's economic value "lies in the competitive advantage" it gives its owner "over others." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1012 (1984). Thus, SS&C's complaint properly pleads the existence of trade secrets.

Arcesium makes much of a "specificity requirement" for pleading the existence of trade secrets, arguing that SS&C's complaint contains nothing more than "extraordinarily general categories of information" that "lack sufficient detail." Appellee's Br. at 41. But we have never imposed a "general specificity

rule" for adequately pleading the existence of a trade secret. *See Syntel Sterling*, 68 F.4th at 801. We decline to impose one today.

While we have acknowledged that "[u]nder . . . the DTSA[,] . . . a claimant bears the burden of identifying a purported trade secret with sufficient specificity," *id.*, we also understand that "[a]n exact definition of a trade secret is not possible," *Speedry Chem. Prods., Inc. v. Carter's Ink Co.*, 306 F.2d 328, 331 (2d Cir. 1962). We think it sufficient, then, that a plaintiff's complaint "permit[s] the defendant to ascertain at least the boundaries within which the secret lies." *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 906 (3d Cir. 2021).

Our reluctance to articulate a general specificity rule follows the Third Circuit's approach. It has recognized that "whether a plaintiff has sufficiently disclosed its trade secrets is a fact-specific question to be decided on a case-by-case basis." *Oakwood Lab'ys*, 999 F.3d at 906. And, because "a plaintiff need not spell out the details of the trade secret to avoid dismissal," the "information alleged to be a misappropriated trade secret" need only "be identified with enough specificity to place a defendant on notice of the bases for the claim being made against it." *Id.*

Applying this standard here, SS&C's complaint sufficiently puts Arcesium on notice of the kind of information it is alleging is a trade secret. The complaint does not simply list categories of information and items alleged to be trade secrets, such as Geneva's "executable software." It also explains the function of each item, by, for example, describing the software as "stor[ing] investment data, portfolio data, price data, transaction data, and other data in a proprietary object-oriented relational database." Compl. ¶ 21.

SS&C's complaint also describes how these items or functions can be used. Its integration layer, for example, allows developers "to run Geneva specific functions and queries, to extract data from" or "input data into specific data fields in the Geneva database, and develop interconnections with other systems." *Id.* ¶ 22. While general, these descriptions are more detailed than those in other cases where district courts have deemed pleadings to be too vague to meet the pleading standard. *See, e.g.*, *TRB Acquisitions LLC v. Yedid*, No. 20-CV-0552 (JMF), 2021 WL 293122, at *2 (S.D.N.Y. Jan. 28, 2021) (granting dismissal where plaintiff identified its alleged trade secrets as its "core brand and marketing plan strategy," with no "particulars of how its strategies and plans function"). SS&C has thus identified its trade secrets with sufficient specificity.

Because at the pleading stage, SS&C need show only that it is plausible that the information identified is a trade secret, and because it has done so, SS&C has adequately alleged the existence of trade secrets.[6]

**b. Misappropriation**[7]

"[T]rade secrets need not be exactly copied in order to impose liability." *Vt. Microsys., Inc. v. Autodesk, Inc.*, 88 F.3d 142, 148–49 (2d Cir. 1996). Instead, they need only be generally "disclose[d] or use[d]" after acquisition by "improper means," 18 U.S.C. § 1839(5)(B), which, as relevant here, means acquisition by "misrepresentation, breach or inducement of a breach of a duty to maintain secrecy." 18 U.S.C. § 1839(6).

We have never attempted to define what constitutes "use" under the DTSA. But the DTSA itself seems to contemplate an expansive definition: It prohibits any

[6] Ultimately, the question of whether SS&C possessed trade secrets is a "question of fact" for the jury. *See Chevron U.S.A., Inc. v. Roxen Serv., Inc.*, 813 F.2d 26, 29 (2d Cir. 1987) (collecting cases). We conclude today only that the facts in SS&C's complaint, taken as true, sufficiently allege a trade secret.

[7] In addition to the factual allegations in its complaint, SS&C also provided the district court with updated "trade secret disclosures" that "described additional evidence" of "Arcesium's misconduct" as it learned about new details through discovery. Appellant's Br. at 20. Because we conclude that SS&C's complaint adequately states a claim for misappropriation, we need not consider the extent to which a district court may rely on these supporting documents when ruling on a motion to dismiss.

"disclosure or use of a trade secret. . . by a person who . . . used improper means to acquire knowledge of the trade secret." *Id.* § 1839(5)(B)(i). "In the absence of . . . a [statutory] definition," however, "we construe a statutory term in accordance with its ordinary or natural meaning." *F.D.I.C. v. Meyer*, 510 U.S. 471, 476 (1994). Black's Law Dictionary defines "use" as "[t]o employ for the accomplishment of a purpose" or "to avail oneself of." *Use*, Black's Law Dictionary (12th ed. 2024). And:

> [w]hen interpreted specifically in the context of trade secret misappropriation, the term "use" has been broadly defined as any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant[.] . . . Thus, marketing goods that embody the trade secret, employing the trade secret in manufacturing or production, relying on the trade secret to assist or accelerate research or development, or soliciting customers through the use of information that is a trade secret . . . all constitute 'use.'

*Oakwood Labys.*, 999 F.3d at 909.

This broad definition tracks our caselaw. We have recognized trade secret misappropriation where a defendant's product was only "similar" to the plaintiff's alleged trade secret. See *Integrated Cash Mgmt. Serv., Inc. v. Digit. Transactions, Inc.*, 920 F.2d 171, 17 –75 (2d Cir. 1990). And district courts within this Circuit appear regularly to find that plaintiffs have sufficiently alleged misappropriation even

where the complaint alleges no more than that the defendants used the trade secrets to better their own knowledge. *See, e.g.*, *Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 390 (S.D.N.Y. 2023) (concluding that a jury could find use from defendants "stud[ying] the information" to "inform[] their subsequent decisionmaking and work product"); *KCG Hldg's, Inc. v. Khandekar*, No. 17-CV-3533 (AJN), 2020 WL 1189302, at *11 (S.D.N.Y. Mar. 12, 2020) (finding misappropriation where the defendant accessed the alleged trade secrets to "increase his knowledge base").

Applying this definition to the case at bar, SS&C sufficiently alleges use. It alleges that Arcesium: (1) used Geneva trade secret information to develop its own software program, Trinity, Compl. ¶¶ 3–4, specifically by replicating Geneva's loader formats, data models, and integration layer, *id.* ¶¶ 68–69; (2) used Geneva's functions to solve problems Arcesium was having in developing its own platform, *id.* ¶ 51; (3) and, among other things, used Geneva's database schema, data model, and integration layer to develop Nautilus, an interface built to connect the Arcesium platform to Geneva even after Arcesium's license to do so expired, *id.* ¶¶ 58–66.

SS&C also alleges circumstances that support its allegations of use. They include: (1) Trinity's accelerated development and transition timeline, *Id.* ¶¶ 18, 53; and (2) Arcesium's solicitation of Geneva customers on the ground that Trinity could "mimic Geneva's functionality," *id.* ¶¶ 81–84. SS&C alleges that Arcesium uses of the trade secrets were in violation of confidentiality and non-disclosure agreements. *See id.* ¶ 32. While we need not address whether each individual allegation alone would withstand a motion to dismiss, the sum of these allegations—that Arcesium, in direct contravention of its contractual requirement, employed Geneva trade secrets to develop and market its own product—sufficiently alleges a claim for use after acquisition by improper means. *Cf Syntel Sterling*, 68 F.4th at 806 ("We find it fanciful to suggest that TriZetto would authorize Syntel to use its trade secrets to compete for business without saying so.").

The district court, in reaching its conclusion that SS&C did not adequately allege misappropriation, relied heavily on the external documents that SS&C incorporated into its complaint, along with Arcesium's assertions of what those documents show. The district court may, of course, consider at the motion-to-dismiss stage documents incorporated by reference into SS&C's complaint. *See*

*Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam). We have cautioned, however, that where a plaintiff incorporates into its complaint a "unilateral writing by a defendant," the court must "consider why a plaintiff attached the documents" rather than "accepting as true every word." *Pearson v. Gesner*, 125 F.4th 400, 407 (2d Cir. 2025). "Such unilateral documents may reflect the defendant's version of contested events or contain self-serving, exculpatory statements that are unlikely to have been adopted by the plaintiff." *Id.*

The documents relied upon by the district court here seem to be the kind warned about in *Pearson*: Many are Arcesium's internal emails that discuss how (and whether) Arcesium's platform should mimic Geneva's functionality. *See, e.g.*, *SS&C Techs.*, 2024 WL 5186530 at *12–*13 (interpreting an email chain in which Arcesium employees discuss, among other things, how to describe the technical requirements of Trinity without reference to Geneva). "[T]reating" such documents "as true simply because it was attached to or relied upon in the complaint . . . would enable parties to hide behind untested, self-serving assertions." *Pearson*, 125 F.4th at 407. The district court should not, then, have

accepted Arcesium's internal statements as true for the purpose of resolving the motion to dismiss.

But the district court made a more fundamental error. "The court's function on a Rule 12(b)(6) motion is not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985). By comparing Arcesium's explanations of the email chain to the allegations levied in SS&C's complaint and concluding that Arcesium has the better interpretation, the district court engaged in impermissible fact-finding.

In so doing, the court noted that where "a document relied on in the complaint contradicts allegations in the complaint, the document, not the allegations, controls, and the court need not accept the allegations in the complaint as true." *SS&C Techs.*, 2024 WL 5186530 at *13. Perhaps. But the contents of the documents on which SS&C relies do not contradict its allegations. Rather, Arcesium's *interpretation* of and *explanation* for the documents differ from SS&C's. This is, of course, to be expected in any litigation. And although we have permitted district courts to look to incorporated documents when evaluating a

complaint at the motion to dismiss stage, we have never allowed them to take on the role of the jury when doing so.

SS&C's complaint states facts from which a reasonable juror could conclude that it possessed a trade secret, and that Arcesium misappropriated that secret. It therefore "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678.

To be sure, our opinion should not be read to opine on the ultimate merits of SS&C's claims, or to suggest a correct reading—one way or the other—of these emails. That the district court improperly credited Arcesium's explanations of the emails in ruling on the motion to dismiss does not mean that this action will survive at a later stage. The district court's error was in its consideration of the allegations at the pleading stage. And our opinion should be understood only to concern as much. As with the existence of trade secrets, misappropriation must eventually be proven.

* * *

Because we conclude that the district court erred in granting Arcesium's motion to dismiss, we need not and do not decide whether it erred in declining to grant SS&C's motion to vacate and amend its complaint.

## CONCLUSION

We have considered the parties' remaining arguments on appeal and conclude that they are without merit. For the reasons explained above, we **REVERSE** the district court's order granting Arcesium's motion to dismiss and **REMAND** the case for further proceedings consistent with this opinion.